BANCO INTERNATIONAL,
INC. Plaintiff,

v.

GOODY'S FAMILY CLOTHING,
Defendant.

No. 3:96–CV–578.

United States District Court,
E.D. Tennessee,
Northern Division.

June 22, 1999.

Frederick L. Conrad, Jr., Ambrose, Wilson, Grimm & Durand, Knoxville, TN, for Banco International, Inc., plaintiffs.

H. Bruce Guyton, J. Chadwick Hatmaker, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN, for Goody's Family Clothing, Inc., defendants.

## MEMORANDUM OPINION

MURRIAN, United States Magistrate Judge.

This matter was referred to the undersigned pursuant to Fed.R.Civ.P. 73 for all further proceedings including trial and entry of judgment. The case was tried on November 13, 1997, and final arguments were heard on November 21, 1997. The following constitute the undersigned's findings of fact and conclusions of law. Fed. R.Civ.P. 52(a).

This is a breach of contract action wherein the plaintiff, Banco International, Inc. ("BANCO") seeks recovery of damages suffered as a result of the alleged wrongful cancellation of a contract arrangement by defendant, Goody's Family Clothing, Inc. ("Goody's").[1] Jurisdiction is

---

1. The contractual arrangement between the parties consisted of purchase orders for children's clothing which were to be filled in three shipments as follows:

First shipment—purch. orders 44333, 44336—due in Knoxville, Tennessee, September 30, 1994,

Second shipment—purch. orders 44337, 44334—due in Knoxville, Tennessee, October 5, 1994,

Third shipment—purch. orders 44335, 44338—due in Knoxville, Tennessee, November 5, 1994.

Plaintiff's Exhibit 29 describes the three shipments and their delivery dates. I will refer to all three installments as "the contract."

grounded upon 28 U.S.C. § 1332, and is not in dispute.

## I. *Contentions of the Parties*

Banco contends that Goody's contracted with Banco to purchase private label goods; that on or about July 13, 1994, Goody's agreed to amend the delivery date of the first shipment to September 30, 1994, and assured Banco that letters of credit would be amended appropriately; that on or about August 23, 1994, and prior to the contractual delivery date of the goods, Goody's agents contacted Banco and wrongfully terminated the contract after Banco had incurred considerable expense; that on or about August 25, 1994, Banco assured Goody's that it could and would comply with Goody's purchase orders; that Goody's refused to accept these assurances, failed to follow through on requested meetings, and continued in its position of having canceled the contracts; that Goody's confirmed its cancellation of the contract by written correspondence; that Banco took steps to mitigate the damages; and that damages were incurred by Banco in the amount of $418,197.00.

Goody's admits that it entered into a contract with Banco for the purchase of private label goods but contends that it properly exercised its right to cancel the contract by written correspondence on or about August 29, 1994. The parties agreed to amend the delivery date of the first shipment but Goody's denies that it agreed to amend the delivery date of other shipments of goods; Goody's denies that it wrongfully, unlawfully, or without good cause or justification canceled the contract; and Goody's denies that it committed any breach of contract against Banco.

It is Goody's position that it did not breach the contract because the termination of the contract was justified by the plaintiff's actions. Goody's contends that there was an anticipatory repudiation or breach of the contract by Banco. In other words, Goody's claims that it was justified in canceling its contract with Banco because it reasonably believed the plaintiff would not have been able to deliver the first shipment of goods by the time required in the contract. Goody's denies that it is liable to Banco for damages in any amount.

It is undisputed that Article 2 of the Uniform Commercial Code as adopted in Tennessee is the controlling, substantive law. Pretrial Order, Part V [Doc. 44]. Also, there is no dispute that Goody's has the burden of proving its anticipatory breach defense. *Id.*, Part IV.

## II. *Findings of Fact*

In April, 1994, the parties entered into a series of purchase orders for the development and delivery of custom made, private label boys and girls windsuits (jogging suits). The contracts were for a total of 62,748 windsuits at a total contract price of $749,103.60. The first shipment of 26,640 windsuits had to be at Goody's distribution center in Knoxville, Tennessee, by September 30, 1994, or the order was subject to cancellation.[2]

Goody's orally canceled the entire contract (*i.e.*, all six purchase orders) at approximately 3:00 P.M., Knoxville, Tennessee, time on August 23, 1994. This was accomplished by a telephone call to Banco's headquarters in Humble, Texas. This notice was then immediately passed along to Muhammed Akhtar, the president and owner of Banco, who was in Bangladesh where the windsuits were to be manufactured.[3] Bangladesh time is 12 hours ahead of Eastern Daylight Time and so

---

2. Banco does not dispute that it had the responsibility, under the contractual arrangement, to see that the first shipment of 26,640 windsuits was at Goody's Knoxville distribution center before October 1, 1994. Originally, the cancellation date was September 15, 1994, but it was moved back to October 1, 1994, in July, 1994 at Goody's request.

3. The fabric was manufactured and dyed in Korea and shipped to Bangladesh by sea. The accessories, trimming, labels, tags, were manufactured in Hong Kong.

Mr. Akhtar received notice of the cancellation around 3:00 A.M. in Bangladesh on August 24, 1994.[4] Mr. Akhtar called Tom Baatz, Goody's boy's wear buyer, and asked if the contract was indeed canceled. Mr. Baatz told him it was due to Banco's dispute with its subcontractor. He composed a letter to Goody's about 9:00 A.M. the morning of August 24 and sent it by facsimile transmission. Plaintiff's Exhibit 26. He sent a second letter dated August 25, 1994, by facsimile transmission. Plaintiff's Exhibit 29. In both letters, Mr. Akhtar represented that although Banco was behind schedule, it could meet the September 30, 1994, delivery date for the first shipment if it shipped by air freight,[5] it could meet the October 5 deadline for the second shipment if it shipped by air freight, and it could meet the delivery deadline for the third shipment by shipping by sea. Shipping by air freight was over six times more expensive than shipping by sea and Banco would have to absorb the cost. Plaintiff's Exhibits 20 and 29 (cost of air freight $53,600 as opposed to $8,400 by sea).

Goody's did not accept Banco's assurances of performance and formally confirmed cancellation of the entire contract by letter dated August 29, 1994. Plaintiff's Exhibit 33.

Among the many issues raised by the parties in this case, there are four which appear to be most important to the undersigned. First, why was the September 30 delivery date important, if it was? Second what did Goody's know when it canceled the contract? If Goody's did have grounds to cancel the contract on August 23, 1994, did the assurances given by Banco shortly thereafter amount to a retraction of any anticipatory repudiation? Fourth, if Goody's was justified in canceling the first shipment, was it justified in canceling the entire contract?

## A. *The Importance of the Delivery Date*

For a clothing retailer like Goody's, time is of the essence in regard to delivery of clothing from its vendors. The contract between Goody's and Banco provided, in pertinent part,

*Late Shipments.* Shipments after "Automatic Cancellation Date" will be treated as tender of non-conforming goods and WILL BE REFUSED AT OUT DOCKS. Purchaser's schedules are based upon the agreement that the goods will be delivered to Purchaser by the dates specified on the face of the Purchase Order. Time is therefore of the essence and if goods are not delivered within the time specified hereon, Purchaser may reject such goods and cancel this Purchase Order. The acceptance of late or defective deliveries shall not be deemed a waiver by Purchaser of its right to cancel this Purchase Order, or to refuse to accept further deliveries.

Plaintiff's Exhibit 14. The cancellation dates on the three shipments were as follows: September 30, October 5, and November 5, 1994.

Tom Baatz, the boy's wear buyer at Goody's at the relevant time, testified as follows:

Q. Can you tell us, Mr. Baatz, what would have been the result at Goody's if—if Goody's had waited until the delivery dates under these purchase orders for these goods from Banco, but Banco and Ratan[6] had not resolve[sic] their differences, and as a result, you didn't receive any of these goods?

---

4. I will refer to the cancellation date as August 23, the date in Knoxville Goody's called Banco.

5. The air ship date had been extended to September 14, 1994, by agreement of the parties. Mr. Akhtar proposed air shipment of the first shipment on September 20.

6. Towhid Islam Ratan was a subcontractor who was in a dispute with Banco at the time. His involvement is discussed below.

A. It would have been devastating to the department and to the division and to Goody's Family Clothing. Without looking at it, it was probably putting us at a huge risk of about a million dollars or plus of lost business that we could have realized.

Q. You mentioned earlier dates of October/November/December as a selling period for these goods?

A. Correct.

Q. Are you familiar with the term "seasonal selling"?

A. Yes.

Q. What does seasonal selling mean?

A. The seasonal—the seasonality at which the product is going to sell. October/November/December would probably be referred to as the holiday season, the holiday selling period.

Q. What type of a window does that give Goody's in terms of getting in products for sale during that time period?

A. You would have typically a 60–day period of time which you could capture sales at regular price, which would be the month of October and November. On Thanksgiving weekend, the business would get highly promotional and remain that way through the month of December.

Q. Does that mean markdowns?

A. Correct.

Q. So, is there a selling season when you can expect to get your retail price, and then after that, your expectation is you would be selling for less, making less?

A. Correct. The—the item itself was a holiday item and was not going to be of any real value to the department going into January, February and March.

Deposition of Tom Baatz at 31–32 [Doc. 97].

George Rubin, who was the senior vice-president of merchandising, advertising and store operations at Goody's at the relevant time, testified that had Banco failed to deliver the goods on time it probably would have been impossible to replace the product. He also said that the products would have been advertised but unavailable to customers and this would have had a detrimental effect on Goody's. Deposition of George Rubin at 34 [Doc. 98]. He said that after the contract was canceled, Goody's attempted to replace the goods and was able to do so to some extent. *Id.* at 35–36.

The undersigned finds that the delivery dates were expressly made to be of critical importance to the contracting parties. The failure of Banco to deliver on time would substantially impair the value of the contract to Goody's.

### B. *What Did Goody's Know When It Canceled the Contract?*

On July 13, 1994, Tom Baatz, the boy's wear buyer at Goody's, contacted Mr. Akhtar by telephone and asked him to push back the delivery date on the first shipment of windsuits from September 15 to not later than September 30, 1994. This was agreed to by the parties. Mr. Baatz testified as follows:

A. At one point, I had decided to readjust the flow of my product so the product would be more timely on the floor. I felt I was probably two weeks, three weeks too early on my receipts. So, I had called Mr. Akhtar to ask him if I could move my deliveries back a couple of weeks. At that time, he was very obliged to move the deliveries back. He said that the product was not ready or was not going to be ready for the original delivery dates, and that he was happy with the request to move the goods back, which started to raise red flags.

Q. What started to raise red flags?

A. The fact that he was, at that time, telling us that he was behind schedule, and the goods were running late.

Q. Well, if you're moving the deliveries back—if you're asking him to move his delivery schedule back a couple of weeks, how does it raise a red flag to you or how did it raise a red flag to you that he would not have— he said he would not have been ready at the original date? I don't understand.

A. At that time, when I'd asked to move the deliveries back, he had made a statement that he was happy to move the orders back, that he was running late, that we had saved him $40,000.00, $50,000.00 in air freight charges if he was going to meet the original delivery date.

Deposition of Tom Baatz at 15–16 [Doc. 97]; *see* Plaintiff's Exhibit 42. Mr. Akhtar testified that he told Mr. Baatz on July 13 that he appreciated the date being moved back to September 30 because he, Akhtar, was under a lot of pressure. As indicated, "red flags" were going up at Goody's in regard to this contract as early as mid-July, 1994.

In a letter to Goody's dated August 10, 1994, Mr. Akhtar acknowledged that Banco was "running around 25 days behind schedule due to one month delay in opening the [letter of credit]." Plaintiff's Exhibit 20.[7] Mr. Akhtar also stated in his letter that "[w]e have started the production and scheduled the first shipment to leave Bangladesh on the [sic] August 25, 1994.... We have purchased around U.S. $450,000.00 piece goods, lining and accessories for the orders. Piece goods are cut and are in production." At the time the contract was canceled, Goody's had good reason to believe that these representations were false.

The only production that would take place before the contract was canceled was a "production run" done by Attune Garments, LTD ("Attune"), a subcontractor of Banco's and a "production run" done by City Apparel, another subcontractor and a factory owned by Mr. Akhtar and his brother. Mr. Akhtar stated that he rejected the production run done by Attune on the afternoon of August 10, 1994, due to poor quality. He said this was after he had already faxed his August 10, 1994, letter to Goody's stating *inter alia* that the "piece goods are cut and are in production."

A production run of the garments had to be approved by Goody's before Banco could be paid under the terms of the letter of credit. A production run done by City Apparel for the first shipment was approved by Goody's on August 19, 1994. Plaintiff's Exhibit 30. The production run is supposed to be produced by the actual production line that will produce the product.

In a letter dated August 11, 1994, Mr. Akhtar requested that the delivery date on the second order (purchase order numbers 44337 and 44334) be moved from October 5, 1994, to October 16 or 17 to give Banco "some breathing room." Plaintiff's Exhibit 22. This raised more red flags with Goody's.

Around August 20, 1994, a discussion occurred between George Rubin, Randy Hodge and Tom Baatz at Goody's. They were becoming increasingly concerned about delays in delivery of the windsuits. Mr. Rubin testified as follows:

Approximately, as I recall, around the 20th of—in that period around the 20th of August, Randy and Tom came to me and we discussed the, what appeared to be the seriousness of the delivery information that was becoming available to

---

**7.** The alleged delay by Goody's in opening the letter of credit for Banco is a non-issue in this case. Banco is not contending that Goody's interfered with Banco's performance of the contract. Mr. Akhtar testified that he could have shipped the goods on time for a timely delivery notwithstanding Goody's alleged delay in opening the letter of credit.

us. You know, the delays in shipment. It just didn't appear that the goods were getting made overseas, and we were concerned about the critical nature of the product, the timing of the year, and whether this large program was—it appeared to us was, because of this communication, was beginning to collapse. And we were beginning—we were concerned about the risk that we had financially with the amount of money we had invested in this and how we were going to replace this product if this program fell apart. Also it appeared that this goods was going to need to be air freighted, which is an enormous cost, and sometimes when this occurs in the business, the cost has to come from somewhere so you become really concerned about how the quality of the goods are going to come. Because somebody's got to pay for this air freight, and it's an enormous amount of money, and many times when you get involved in this air freight situation, you really have to keep an eye on the quality of the product because sometimes quality of the product is taken down to a different level to save money to pay for this air freight.

Deposition of George Rubin at 24–25 [Doc. 98].

Mr. Rubin testified that the goods in the first shipment could have been shipped from Bangladesh to Knoxville in about 11 days. Deposition at 40. He incorrectly stated that the delivery deadline was September 25, 1994. He stated that Mr. Akhtar's plan to air ship the first order on September 20, 1994, would have put the order into Knoxville "closer to the 1st of October." Deposition at 28. Of course, the cancellation date was October 1, 1994.[8]

At the inception of this contract, Mr. Akhtar had led Goody's to believe that the windsuits would be produced in Banco's factory. Deposition of Tom Baatz at 11, 29, 30 [Doc. 97]. Goody's was not aware that production was going to be subcontracted to Attune or City Apparel. It therefore came as a shock and surprise when the Managing Director of Attune, Towhid Islam Ratan, spoke by telephone with Randy Hodge at Goody's on August 23, 1994, and told Hodge that Attune was in possession of all the fabric and other raw materials for the contract; that Attune and Banco were in a dispute over an alleged $70,000 debt Banco had to Attune; that Attune would not ship Goody's order through Banco; that the shipment had been "momentarily delayed"; but that Attune was willing to produce the garments for Goody's under certain conditions, including establishment of a letter of credit in Attune's favor by Goody's. This was followed up by a letter dated August 25, 1994, which was faxed to Goody's. Exhibit 28 to the deposition of Mr. Ratan [Doc. 72].

Needless to say, this caused grave concern at Goody's. Goody's already suspected there were problems but had no idea that Banco did not control the raw materials needed for the product and that the work had been subcontracted out to Attune. Mr. Akhtar testified that Attune was only supposed to do a portion of the cutting and sewing of the goods but the fact remained that Attune had possession of *all* of the raw materials for the contract on August 23, 1994, and was refusing to manufacture them for Banco. Mr. Akhtar stated in a letter dated September 14, 1994, that when Mr. Ratan discovered that Attune's letter of credit with Banco was canceled on August 22, 1994,

he called our customer in USA and defamed us to them. He send [sic] a fax

---

**8.** Banco argues that this testimony is an admission by Goody's that it knew that Banco could have come very close to meeting the September 30 deadline for the first shipment. As indicated below, Goody's never really knew at or about the time of cancellation just

how Banco planned to gain control of the raw materials to produce the goods. I view Mr. Rubin's statement about "closer to the 1st of October" as making the assumption that Banco could obtain the raw materials to complete the contract.

to them saying that he is in possession of all the fabrics and accessories of 5500 dz. of [sic] jogging suits. He will neither manufacture the jogging suits nor will [he] give the goods to Banco International. If they want the jogging suits, they must open [a letter of credit] to Attune Garments directly.

*Naturally,* our customer sensed problems in the orders. They immediately canceled the orders and decided to purchase ready made goods from other local vendors. In the process we have lost the order and the customer.

Defendant's Exhibit 49 (emphasis added).

The communications from Mr. Ratan to Goody's made it appear to Goody's that Mr. Akhtar's representations in his August 10 letter were untrue, *i.e.,* it could not have been true that Banco "had started production," that it had scheduled the first shipment to leave Bangladesh on August 25, and that "the piece goods are cut and are in production." [9] Also, his August 11 letter had indicated that he would have difficulty delivering the second shipment by its cancellation date of October 5, 1994. Mr. Akhtar admitted in his testimony at trial that the earliest he could have started production with respect to the Goody's contract was August 23, 1997—after the letter of credit issued in favor of Attune by Banco was canceled. Up until that time, Mr. Akhtar's bank would not issue a letter of credit in favor of Attune in order for Attune to release the fabric and other raw materials for the contract.

Banco argues that it really never knew that the problem was that Goody's thought that Banco could not gain control of the raw materials to start production. In other words, Banco faults Goody's for not asking Banco if it had a plan to gain control of the raw materials for the contract before Goody's canceled the contract or when it refused to reinstate it. Banco's position now is that Attune had issued a *pro forma* invoice for the raw materials, Plaintiff's Exhibit 1, on August 17, 1994, and on August 23, 1994, just before cancellation of the contract, Banco was in a position to extend the required letter of credit to Attune in order that the goods could be transferred to World Fashions, LTD, which would begin production.

The difficulty with Banco's position is that it kept Goody's in the dark in regard to just how Banco proposed to carry out its contractual obligations to Goody's when it certainly appeared to Goody's at the time of cancellation and after that Banco did not have control of, and would not get control of, the raw materials necessary to produce the windsuits.

Mr. Akhtar testified that on August 23 he received notice that Banco's letter of credit to Attune had been canceled and he was then able to open a letter of credit in favor of Attune to get the raw materials to World Fashions, LTD in accordance with the August 17, 1994, *pro forma* invoice.[10] Apparently, however, Banco's cancellation of Attune's letter of credit caused Mr. Ratan to call Randy Hodge at Goody's on August 23 and this led to the contract cancellation. Mr. Akhtar never opened the new letter of credit in favor of Attune for shipment of the raw materials to World Fashions. His attitude was "why should I, Goody's canceled the contract." Thus, Mr. Akhtar chose to leave the financial responsibility for, and the ownership of, the raw materials with Attune. Mr. Akhtar testi-

---

9. The only production of garments that had taken place at the time of the cancellation of the contract were the "production runs" done at Attune and City Apparel on or about August 10, 1994. A few garments (about 18) were produced to send to Goody's as samples for approval before actual production began. The piece goods could not have been cut and in production on August 10, 1994.

10. It was not until about 3:00 P.M. Bangladesh time on August 24th that Banco got word of the contract cancellation. During the 15 or so hours between the notice that he could open a new letter of credit in favor of Attune and Goody's notice of cancellation, Mr. Akhtar made no effort to open the letter of credit. Neither did he do so thereafter.

fied that he could have and would have obtained possession and control of the raw materials if Goody's had just reconsidered its cancellation decision. He said that he could have opened up five production lines at City Apparel and five at World Fashions, produced the first shipment in 11 days and had it in Knoxville by September 30, 1994.

Goody's never knew just how he proposed to do this, however. Goody's was not told at or near the time of cancellation how Banco intended to gain control of the raw materials to produce the goods and Mr. Akhtar made it clear in his testimony why.

Q. Why didn't you tell Mr. Rubin in these letters and phone conversations where the raw materials were and where the fabric was and what you were going to have to do to get it?

A. It's none of their business. The contract between them and us is to make jog suit windsuits and deliver them within contractual date in Tennessee. It is none of Goody's business where the raw materials are, where they are made, where they are, who had them, who cleared customs, who imported. It's none of their business.

Excerpt of Proceedings, November 13, 1997, at 63–64 [Doc. 100].[11]

Thus, it is clear that had Goody's asked Mr. Akhtar how he proposed to gain control of the raw materials to perform the contract before the contract was canceled, the answer would have been "none of your business." Furthermore, Mr. Akhtar knew from August 23rd on that the problem Goody's was having in continuing with the contract was that Attune controlled all the raw materials for the contract, it would not manufacture for Banco and it would

not ship through Banco. In his letter to a bank dated September 14, 1994, Mr. Akhtar stated that Mr. Ratan had sent a fax to Goody's

> saying that he is in possession of all the fabrics and accessories of 5500 Dz of jogging suits. He will neither manufacture the suits nor will [he] give the goods to Banco....

Defendant's Exhibit 49. I find incredible Mr. Akhtar's contention that he really never knew that Banco's lack of possession and control of the fabric and other raw materials needed to perform the contract was bothering Goody's.

Mr. Akhtar knew what was troubling Goody's on August 23 and for the several days following when he tried to give them adequate assurance of Banco's ability to perform. Despite this, he never gave Goody's any reason to believe that Banco had the ability to perform the contract. For all Goody's knew, Banco did not have possession or control of the raw materials needed and Banco was not going to get possession or control. Moreover, Goody's knew that Mr. Akhtar had been untruthful with them in his August 10 letter and had reason to believe he was untruthful in his August 24 letter when he stated: "Today we are preparing the fabric for cutting. Sewing should start tomorrow." Plaintiff's Exhibit 26.

Mr. Baatz and Mr. Rubin were the Goody's employees who made the decision to cancel the contract. Mr. Baatz testified as follows with regard to the raw materials:

Q. Did Mr. Akhtar ever advise you as how he intended to make these goods when Attune Garments Company and Mr. Ratan was holding all the raw materials that would be used to make the goods?

---

11. Although the question of damages will not be reached in this case, it is noted that Mr. Akhtar's attitude of refusing to disclose Banco documents is consistent with his attitude that it was none of Goody's business how Banco

intended to perform the contract when it appeared to Goody's that Banco could not get possession and control of the raw materials to do the work. *See, e.g.,* Excerpt of Proceedings, November 13, 1997, at 24–25; 27–30.

A. He was not able to tell us how he was going to be able to do that, no.

Deposition of Tom Baatz at 33–34 [Doc. 97].

After Mr. Baatz received the fax from Mr. Ratan dated August 24, 1994,[12] he met with his boss, George Rubin.

Q. What was the purpose of that meeting?

A. To bring him up to date with the position that I had with this vendor in this category. The wind suit category was a category that I felt I had large opportunities in, that was going to be critical for my business in the October/November/December retail selling period. We had worked advertising out in advance, and it was going to compromise my position on my marketing or advertising for upcoming months.

So, I had the discussion with George saying, "George, I was told the production was starting the first part of August. The mid part of August I got a production sample. The end of August I get a phone call and a fax saying that nothing is being made. Now I'm concerned because what was presented to me as a production sample was truly not a production sample. I have got large sales plans, and this program is in the process of falling apart, and I need to protect my position and Goody's Family Clothing's position for the upcoming summer months."

Q. And was any type of decision then made about what to do with this wind suit program, as far as Banco International is concerned?

A. We decided to cancel the goods and reinvest the money into wind suits. We fund out that, because of the timing of this cancellation, that the wind suit market was a very difficult market, and what we would commonly call was being dry, there was not a lot of product out in the market.

So, we were able to replace a small portion of our initial buy, then we had to reposition dollars into other categories and other brands. I repositioned dollars into fleece tops and into Bugle Boy as a vendor.

*Id.* at 26–27.

**C. Did the Assurances Given by Banco Shortly After the Cancellation of the Contract Amount to a Retraction of Any Anticipatory Repudiation?**

I answer this question in the negative. Goody's had reasons to doubt Mr. Akhtar's credibility. Furthermore, it never had reason to believe Banco could gain possession and control of the fabric and other raw materials needed to perform the contract. Obviously, without these items, there could be no performance. Mr. Akhtar's attitude was that it was none of Goody's business. His unsupported promises to do what he was supposed to do were not adequate assurance under the circumstances.

**D. Was Goody's Justified in Canceling the Entire Contract**

I answer this question in the affirmative. The entire windsuit program for the 1994 Holiday season depended on all of the shipments being at Goody's distribution center in a timely manner. If Banco was unable to deliver the first shipment of windsuits to Goody's by the date in the first purchase order (September 30), the entire windsuit program for the 1994 holiday season would collapse resulting in a substantial loss of money and good will to Goody's.

**III. Conclusions of Law**

Anticipatory repudiation of a contract for the sale of goods is governed by T.C.A. § 47–2–610.

Anticipatory repudiation.—When either party repudiates the contract with respect to a performance not yet due the

---

12. Exhibit 28 to the Deposition of Towhid Islam Ratan [Doc. 72].

loss of which will substantially impair the value of the contract to the other, the aggrieved party may:

(a) for a commercially reasonable time await performance by the repudiating party; or

(b) resort to any remedy for breach (§ 47–2–703 or § 47–2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(c) in either case suspend his own performance or proceed in accordance with the provisions of this chapter on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (§ 47–2–704).

"[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." T.C.A. § 47–2–610, Comment 1. "It is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation." *Id.*, Comment 2; *see generally* Milton Roberts, *What Constitutes Anticipatory Repudiation of Sales Contract Under UCC 6–610*, 1 A.L.R.4th 527 (1980).

█ Banco's failure to start actual production of the windsuits prior to cancellation of the contract on August 23, 1994, Banco's apparent inability to gain possession and control of the fabric and other raw materials necessary to perform the contract, Banco's false representations about production, and Banco's failure to give Goody's adequate assurances that it could perform the contract in a timely manner during the days following cancellation are the primary actions by Banco which reasonably indicated to Goody's that Banco had rejected its continuing obligation under the contract. These actions justified Goody's suspension of its own performance and cancellation of the contract. T.C.A. § 47–2–610(c).

In all contracts governed by Article 2 of the Uniform Commercial Code there is a continuing obligation of good faith and reasonableness. T.C.A. § 47–1–102(3). In this case, Goody's came to realize by August 23, 1994, that Mr. Akhtar had not been truthful with Goody's about the status of production of the windsuits; Goody's had reason to believe that the production samples were not production samples at all; Banco did not have possession of the fabric and raw materials to perform the contract; and, as far as Goody's knew, Banco had no prospects of obtaining possession and control of those raw materials. In the days subsequent to the cancellation, Banco's proffered "reasonable assurances" consisted of more promises from Mr. Akhtar (whose credibility had been severely damaged) but without an explanation of just how Banco proposed to perform because Mr. Akhtar believed it was "none of Goody's business."

The Court can look to sources of law outside Article 2 to supplement, but not displace, its provisions. T.C.A. § 47–2–103. An act can be a repudiation of contract when it is "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." *Restatement of Contracts* 2d § 250(b). Of course, no one will ever know if Banco could have delivered the first shipment to Goody's distribution center in Knoxville on or before September 30, 1994. That is beside the point, however. The critical question is whether Banco's actions reasonably indicated to Goody's that Banco had rejected its continuing obligation under the contract. T.C.A. § 47–2–610, Comment 2; *Restatement of Contracts 2d* § 250(b). It was this apparent inability to perform without a substantial breach of the contract that justified Goody's in canceling the contract and in refusing Banco's proffered "reasonable assurances" of performance.

█ I find that Goody's was justified in reasonably concluding that Banco could not deliver the windsuits to it by the date set in the first purchase order between the

parties. Additionally, the failure to deliver the goods by that date would have substantially impaired the value of those goods to Goody's. T.C.A. § 47–2–610, and Comment 3. A material inconvenience and injustice would have resulted if Goody's was forced to wait until Banco could actually deliver the goods. *Id.* A late delivery of the windsuits would have substantially impaired the value of the windsuits to Goody's. T.C.A. § 47–2–612; *see also* Corbin, *Corbin on Contracts* § 975 at 963 (One Vol. ed. 1981) ("In the case of a bilateral contract for an agreed exchange of performances, a repudiation of his duty by one of the parties terminates the duty of the other. It gives to the latter the legal privilege of refusing to render the return performance; if sued for such refusal, the plaintiff's repudiation is a good defense."). Late delivery of the first shipment of goods would have substantially impaired the value to Goody's of the remaining goods yet to be shipped. Therefore, Goody's is not liable for canceling those remaining deliveries. T.C.A. § 47–2–612.

For the reasons indicated, judgment will enter in Goody's favor and Banco will take nothing on its claim.

Order accordingly,